# In the United States Court of Federal Claims

Nos. 23-1112, 23-1115, 23-1125, 23-1132, 23-1139.
Filed: November 30, 2023
Re-issued: December 20, 2023[1]

| | |
|---|---|
| SYNEREN TECHNOLOGIES CORP. et al., | ) ) |
| *Plaintiffs*, | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| *Defendant*, | ) ) |
| and | ) ) |
| RIVA SOLUTIONS, INC., et al., | ) ) |
| *Defendant-Intervenors*. | ) ) |

*Alexander B. Ginsberg*, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C., for Plaintiff Syneren Technologies Corp.

*Roger V. Abbott*, Miles & Stockbridge P.C., Washington, D.C., for Plaintiff CAN Softtech, Inc.

*Jon D. Levin*, Maynard Nexsen PC, Huntsville, AL, for Plaintiff Ekagra Partners, LLC.

*Brandon Graves*, Centre Law & Consulting, LLC, Tysons, VA, for Plaintiff JCS Solutions, LLC.

*Thomas K. David*, Reston Law Group, Reston, VA, for Plaintiff The Prospective Group, Inc.

---

[1] The Court initially filed this Opinion and Order under seal to allow the Parties to propose redactions. Following their review, all parties confirm that they do not believe any redactions are necessary. ECF No. 141. Given the haste with which the Court had to resolve this matter, the Court also stated it may make non-substantive edits to the opinion before re-issuance and allowed the parties to propose such corrections as well. Of the five proposed corrections, the Government objects to two as substantive. ECF No. 142. The Court adopted in part the proposed edits, which deal with the Court's overview of the parties' arguments, because they more accurately reflect those arguments.

*Brittney M. Welch*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Franklin E. White, Jr.*, Assistant Director, and *Yariv S. Pierce*, Trial Attorney, for the Government. *Ryan Lambrecht*, U.S. Department of Commerce, *of counsel*.

*Elizabeth N. Jochum*, Blank Rome, LLP, Washington, D.C., for Defendant-Intervenor RIVA Solutions, Inc.

*William A. Shook*, The Law Offices of William A. Shook PLLC, Washington, D.C., for Defendant-Intervenor BrightPoint, LLC.

*Craig A. Holman*, Arnold & Porter Kaye Scholer LLP, Washington, D.C., for Defendant-Intervenor ProGov Partners LLC.

*Eric Scott Crusius*, Holland & Knight LLP, McLean, VA, for Defendant-Intervenor ITC-DE, LLC, D/B/A DOTIT.

*David Francis Dowd*, Potomac Law Group, PLLC, Washington, D.C., for Defendant-Intervenor Koniag Management Solutions, LLC.

*Alexander J. Brittin*, Brittin Law Group, PLLC, Washington, D.C., for Defendant-Intervenor Halvik Corp.

*E. Sanderson Hoe*, Covington & Burling LLP, Washington, D.C., for Defendant-Intervenor T and T Consulting Services, Inc.

## OPINION AND ORDER

**MEYERS, Judge**.

These post-award bid protests challenge the Department of Commerce's re-evaluation and re-re-evaluation of proposals following this Court's decision in *Allicent Tech., LLC v. United States*, 166 Fed. Cl. 77, 146 (2023), as amended (July 18, 2023), reconsideration denied, No. 22-1380C, 2023 WL 4287196 (Fed. Cl. June 30, 2023). Commerce re-evaluated the technical proposals of the prevailing plaintiffs in *Allicent* and made several substantive changes to those proposals. In the end, Commerce found these proposals technically unsatisfactory and again made contract awards to the same offerors as it had in *Allicent*. These protests followed, which kicked off a flurry of activity at Commerce. Upon reviewing the complaints in these protests, Commerce chose to take corrective action to address some, but not all, of the allegations in the complaints. It did this on its own and provided a notice of its corrective action a few days later. The corrective action resulted in changes to the technical evaluations but the same contract award decisions. This triggered the plaintiffs.

According to the plaintiffs, the agency was not permitted to take such corrective action without remand from the Court. But the cases they rely upon belie their arguments. The agency was free to take corrective action that narrowed the issues in dispute so long as it jumped through all the procedural hoops to do so. It did. It cancelled all the prior contract awards, reconstituted

and reconvened the technical evaluation team to re-evaluate proposals, the source selection authority issued a new decision document, and Commerce issued new contracts. Therefore, the Court considers the final evaluation as the operative award decision before the Court. Because those award decisions are rational and find sufficient support in the record, the Court DENIES the plaintiffs' motions for judgment on the administrative record and GRANTS the government's cross-motion for judgment on the administrative record and defendant-intervenors' cross-motions for judgment on the administrative record.

## I. Background

Because the Court set forth the pre-*Allicent* history of this procurement in *Allicent*, *see* 166 Fed. Cl. at 99-105, the Court does not repeat that history here. Instead, the Court focuses on the post-*Allicent* background that is relevant to this series of protests.

### A. The procurement.

On November 12, 2021, the Department of Commerce issued Request for Proposal No. 1131L5-21-R-13OS-0006 (the "RFP") for the Commerce Acquisition for Transformational Technology Services ("CATTS"), seeking proposals to provide "enterprise-wide Information Technology services." ECF No. 68 at AR 1418. These services fell into "6 main task areas: CIO Support, Digital Document and Records Management, Managed Service Outsourcing and Consulting, IT Operations and Maintenance, Information Technology Services Management, and Cyber Security." *Id*. The RFP was for a multi-award indefinite delivery, indefinite quantity ("IDIQ") contract with a one-year base period and four option periods for a total of 10 years. *Id*. The maximum amount of all orders combined was $1.5 billion. *Id*. Commerce intended to award between 15-20 contracts. *Id*. at AR 1488.

The RFP included a Performance Work Statement ("PWS") that provided the contractors' "general responsibilities" for the contract. *Id*. at AR 1421 (RFP § C.3.2). Each task order "will describe the required work to be performed . . . ." *Id*. (RFP § C.3.1). The RFP also included a PWS for Task Order 1, which Commerce intended to award at the same time as the IDIQ contracts. *Id*. at AR 1483. Although Commerce awarded 15 IDIQ contracts, it did not award Task Order 1.

### B. Technical evaluations.[2]

Under RFP Section M.2.3(a)a, the Technical factor has four elements, each of equal relative importance. These are:

> a. Demonstrate the Offeror's ability to meet or exceed the Final CATTS PWS [Performance Work Statement] requirements and deliverables as contained in [RFP] Attachment 1, and use proven, innovative methods to meet the Final CATTS PWS requirements, resolve complex issues, and provide continuous process

---

[2] The Court does not address the other evaluation criteria because the post-*Allicent* re-evaluations were limited to the technical proposals.

improvement and implementation, all while maintaining and
tracking high levels of customer satisfaction.

b. Demonstrate how the Offeror's approach will adapt to evolving
technological innovations and the dynamic nature of the
organization (impacted by changing regulations, laws, and
executive directions) to improve service delivery and ensure
ongoing organizational improvement.

c. Demonstrate the Offeror's ability and approach to manage and
staff (to include retaining) key personnel and non-key personnel, to
include teaming arrangements, to support each of the task areas
with the appropriate clearance levels, education, and certifications
to adequately meet the requirements of the Final CATTS PWS for
future task orders.

D. Demonstrate the Offeror's understanding and approach to
provide a smooth, undisrupted transition (phase in and out) to
include:

a. How the offeror will implement a proven, feasible and
successful methodology for transitioning;
b. How the offeror will identify and mitigate transition risks.

*Id*. at AR 1490-91.  The PWS detailed the tasks that were required and made clear that
contractors would need to be able to perform all services within a task area.  ECF No. 77 at AR
29552.

There were also important instructions in Section L of the RFP.  According to Section L,
"[a]ll acceptable proposals must demonstrate the Offeror's understanding of the requirements
and associated risks.  The Government considers statements that the prospective Offeror
understands, can, or will comply with the specifications, or statements paraphrasing the
requirements or parts thereof to be inadequate and unsatisfactory."  ECF No. 68 at AR 1474.
Similarly, the "mere reiteration of the requirement or standard reference material to also be
inadequate and unsatisfactory.  Such responses may result in a proposal being evaluated as
Unacceptable and ineligible for award."  *Id*.  Section L also instructed offerors that "[a] proposal
receiving an 'Unsatisfactory' or 'Fail' rating in one or more factors shall be removed from
further consideration for award or continued evaluation."  *Id*. at AR 1489.

The Source Selection Plan ("SSP") provides the key ratings and their definitions.  For the
non-price factors—i.e., technical and past performance—Commerce would evaluate and
document strengths and weaknesses using the following criteria:

A Significant Strength relates to a benefit to the Government that
appreciably increases the likelihood of successful contract
performance and/or reduces the risk of unsuccessful contract
performance.

4

A Strength is defined as an aspect of the proposal that increases the likelihood of successful contract performance and/or reduces the risk of unsuccessful contract performance.  A Strength must be tied to a benefit to the Government.

A Weakness is defined as a flaw in the proposal that increases the risk of unsuccessful contract performance.  Weaknesses must be tied to an impact or concern to meeting the requirements.

A Significant Weakness is a flaw that appreciably increases the risk of unsuccessful contract performance.  Significant Weaknesses must be tied to a significant impact or concern to meeting the requirements.

A Deficiency is defined as a material failure of a proposal to meet a Government requirement or a combination of Significant Weaknesses in a proposal that increases the risk of unsuccessful performance to an unacceptable level.

A Risk is defined as an aspect of the proposal that may have an adverse impact on an element of performance such as schedule, cost, quality of products or services provided, etc.

ECF No. 68 at AR 1509-10.

For the technical evaluation, Commerce would rate each proposal using the following adjectival ratings:

| Rating | Definition |
|---|---|
| Excellent | Proposal significantly exceeds solicitation requirements, demonstrates an excellent understanding of and approach towards fulfilling the requirements and has salient features that offer significant advantages to the Government that are in addition to what is required.  Any Weakness(es) if identified are overwhelmingly offset by the cumulative effect of Strengths identified.  Represents a very low risk of unsuccessful contract performance. |
| Good | Proposal exceeds solicitation requirements, demonstrates a good understanding of and approach towards fulfilling the requirements and has salient features that offer advantages to the Government that are in addition to what is required.  Any Weakness(es) if identified are offset by the cumulative effect of Strengths identified. Represents a low risk of unsuccessful contract performance. |
| Satisfactory | Proposal meets solicitation requirements and demonstrates an adequate understanding of and approach towards fulfilling the requirements.  Any |

| | |
|---|---|
| | Weakness(es) if identified are partially or mostly offset by the cumulative effect of Strengths. Represents a low to moderate risk of unsuccessful contract performance. |
| Marginal | Proposal minimally meets solicitation requirements.  Weaknesses and/or Significant Weaknesses identified are not offset by Strengths and/or Significant Strengths identified.  Represents a moderate to high risk of unsuccessful contract performance. |
| Unsatisfactory | Proposal does not meet solicitation requirements and contains one or more Deficiencies and/or a combination of Significant Weaknesses that represents a material failure to meet requirements.  Represents a high or unacceptable risk of unsuccessful contract performance. |

*Id.* at AR 1512.

A finding of Unsatisfactory meant that Commerce would not consider a proposal in the best value tradeoff because "[a] proposal receiving an 'Unsatisfactory' or 'Fail' rating in one or more factors shall be removed from further consideration for award or continued evaluation." *Id.* at AR 1489.  The Technical Evaluation Team ("TET") did not recommend awards.

### C.    Post-*Allicent* evaluations.

Following *Allicent*, Commerce terminated all the contracts awarded under the CATTS procurement.  The TET then re-evaluated the technical proposals of 2Aces Integration, LLC,[3] CAN Softtech, Inc. ("CSI"), Ekagra Partners, LLC, JCS Solutions, LLC, and Syneren Technologies Corp.  ECF No. 77 at AR 30414-69.  Because *Allicent* did not require re-evaluations of the price or past performance for any of the offerors, the Source Selection Authority ("SSA") considered the new TET Report, the existing Price Evaluation Team ("PET") Report, and the existing Past Performance Evaluation Team ("PPET") Report and conducted a new best value tradeoff analysis.  *Id.* at AR 30470-82.  In this re-evaluation, the SSA agreed with the TET, PET, and PPET Reports' findings.  He found the proposals from 2Aces, CSI, Ekagra, JCS, and Syneren to be technically Unsatisfactory and unawardable under the RFP.  *Id.* at AR 30482.  Finally, the SSA made new awards to the 15 offerors that got awards in the initial competition based on the prior best value determination.  *Id.*  The Agency sent written debriefs to the unsuccessful offerors between July 7-12, 2023.  *Id.* at AR 32681-33019.

Following the debriefs, The Prospective Group ("TPG") filed a protest at the Government Accountability Office ("GAO").  Between July 18-20, 2023, the four protestors that were parties to *Allicent* filed their protests here and the GAO dismissed TPG's protest there because of the

---

[3] The issues surrounding 2Aces' were not discussed at length in the *Allicent* decision because Commerce recognized quickly that although 2Aces had timely submitted its proposal, the agency failed to evaluate it.  Therefore, the agency agreed to take corrective action and evaluate 2Aces' proposal.  2Aces has not protested the agency's re-evaluation of its proposal.

related protests in this Court.  TPG filed its complaint on July 24, 2023.  The Court then consolidated all protests with *Syneren*.  ECF No. 24.

There was a flurry of activity at Commerce following the protests.  Based on its review of the complaints, the agency chose to take corrective action to address some of the issues raised in these protests.  ECF No. 77 at AR 33021.  On July 20, 2023, Commerce amended its Source Selection Plan ("SSP") by removing two voting members and adding a new voting member of the TET.  *Id*.  While the record does not indicate the reason for the change, the Government has represented to the Court, and the Court has no reason to dispute, that these changes were made because the two former members were no longer with the agency.  *See* ECF No. 87 at 5-6.  On July 21, 2023, Commerce terminated all the contracts awarded under the CATTS RFP.  ECF No. 77 at AR 33089-118.  Also on the 21st, the TET convened and re-evaluated plaintiffs' proposals.  *Id.* at AR 33021-70.  The TET generated a new report signed July 23, 2023, that explains its ratings of plaintiffs' technical proposals.  *Id*.

The SSA then considered the new TET Report, the PET Report, and the PPET Report, which he concurred with.  *Id*.  He then performed a new best-value tradeoff for the five plaintiffs' proposals.  Following his analysis, the SSA found that CSI's, Ekagra's, JCS's, TPG's, and Syneren's proposals were unsatisfactory and did not provide the best value to the government.  The SSA also concluded that the Significant Weaknesses that this Court held in *Allicent* to have been rationally assigned (the "Allicent Significant Weaknesses") were sufficient on their own to render Syneren's, JCS's, and Ekagra's proposals unawardable.  *Id.* at AR 33077-78 (Ekagra), 33080 (JCS), 33082-83 (Syneren).  The plaintiffs then amended their complaints[4] and moved for judgment on the administrative record.  The government and defendant-intervenors have cross-moved for judgment on the administrative record.

Following oral argument, the plaintiffs jointly moved for a preliminary injunction to prevent the Agency from receiving proposals for initial work prior to the resolution of this protest.  ECF No. 131.  The Government opposed the motion because it did not believe that it was violating its voluntary stay by receiving proposals for task orders and believed that resolution of the permanent injunction issues would either prohibit the agency from moving forward with awards or find no error in which case there would be no harm to the plaintiffs.

## II.    Standard of Review

This Court has jurisdiction over bid protests pursuant to the Tucker Act, which requires the Court to review the Government's action under the standards of the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(1) & (4); *Banknote Corp. of Am. V. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under the APA, the Court determines whether the Government's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *Banknote*, 365 F.3d at 1350 (citation omitted).  In other words, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Id*. at 1351 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United*

---

[4] As discussed below, TPG did not amend its complaint when it filed its motion for judgment. Following oral argument, TPG amended its complaint with the Government's consent.

*States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  "When a challenge is brought on the first ground, the courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process."  *Impresa*, 238 F.3d at 1332 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  "Accordingly, the test for reviewing courts is to determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,'" *id*. (quoting *Latecoere*, 19 F.3d at 1356), "and the 'disappointed bidder bears a heavy burden of showing that the award decision had no rational basis[.]'" *Id*. (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)).  "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'"  *Id*. (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

If an error is found in the procurement, the APA further instructs that "due account shall be taken of the rule of prejudicial error."  5 U.S.C. § 706; *see also Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (citations omitted) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.").  The bid protester was prejudiced if "there was a substantial chance it would have received the contract award but for the" challenged action.  *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005)).  To what extent a showing of prejudice is necessary, however, depends on the procurement error.  Specifically, "when an irrational or arbitrary and capricious agency action has occurred, prejudice is presumed, but when a violation of statute or regulation has occurred, there must be a separate showing of prejudice."  *Caddell Constr. Co. v. United States*, 125 Fed. Cl. 30, 50 (2016) (citing generally *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)); *Banknote*, 365 F.3d at 1351; *see also, e.g., Textron, Inc. v. United States*, 74 Fed. Cl. 277, 329 (2006) ("This prejudice analysis, however, should be reached only when the protestor has shown violation of an applicable procurement regulation.  If the court finds that the Government has acted arbitrarily and capriciously, the analysis stops at that finding."), appeal dismissed sub nom. *Textron, Inc. v. Ocean Tech. Servs.*, Inc., 222 F. App'x 996 (Fed. Cir. 2007), and dismissed per stipulation, 223 F. App'x 974 (Fed. Cir. 2007).

Lastly, this bid protest is before the Court pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), which provides for judgment on the administrative record.  *See* RCFC 52.1.  Judgment on the administrative record under RCFC 52.1 "is properly understood as intending to provide for an expedited trial on the record."  *Bannum*, 404 F.3d at 1356.  The rule requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record."  *Id*. at 1354.

## III.   Discussion

### A.    The corrective action is properly before the Court.

Before turning to the merits of any protest, the Court must first determine what final agency action it is reviewing.  According to the Government, the only operative agency action is the contract awards made pursuant to the corrective action that Commerce undertook after four of the five complaints were filed in this Court.  The Plaintiffs, however, contend that award

decision was impermissible under Supreme Court precedent and this Court's rules, so the proper award decision for the Court to review took place between *Allicent* and this case being filed. Because much of the plaintiffs' arguments rely upon the timing of the corrective action, it is important to understand how we got here:

- September 9, 2022—The SSA signed the Source Selection Decision Document ("SSDD-1"), selecting 15 offerors for contract awards.  ECF No. 77 at AR 28375.

- September 16, 2022—Commerce issued a notice to unsuccessful offerors.  *Id*. at AR 28432.

- Sept. 21, 2022—Commerce issued written debriefings to the unsuccessful offerors.  *Id*. at AR 28432-29195.

- May 3, 2023—This Court issued its order in *Allicent* that found certain evaluations arbitrary and capricious and enjoining Commerce from proceeding with awards under the CATTS RFP.

- June 29, 2023—In light of *Allicent*, Commerce issued terminations for convenience for all contracts awarded under CATTS RFP.  *Id*. at AR 30354-413.

- June 29, 2023—The TET Chair signed Amendment 02 to CATTS Technical Evaluation Report ("TET Report-2"), which states the TET reevaluated technical proposals from 2Aces Integration, CSI, Ekagra, JCS, and Syneren.  *Id*. at AR 30414.  The TET found each proposal Unsatisfactory.  *Id*.

- June 29, 2023—The SSA signed a new SSDD ("SSDD-2") to make new awards to the same 15 awardees that SSDD-1 had awarded contracts to.  *Id*. at AR 30482.

- July 3-6, 2023—Commerce executed contracts with the 15 awardees.  *Id*. at AR 30483-32276 (the "July Contract Awards").

- July 18, 2023—Syneren filed its complaint in this action.  ECF No. 1.

- July 19, 2023—CSI and Ekagra filed their complaints in this action.  Case No. 23-1115 ECF No. 1; Case No. 23-1125 ECF No. 1.

- July 20, 2023—JCS filed its complaint in this action.  Case No. 23-1132 ECF No. 1.

- July 20, 2023—Commerce removed two members of the TET and added one new member.  ECF No. 77 at AR 33020.  The Government notified the Court and the parties of this action on July 24, 2023.

- July 23, 2023—The TET Chair approved Amendment 03 to the TET Report ("TET Report-3").  *Id*. at AR 33022.  This included new evaluations of CSI, Ekagra, JCS, TPG, and Syneren.

- July 23, 2023—The SSA signed Amendment 03 to the CATTS SSDD ("SSDD-3") that reevaluated CSI, Ekagra, JCS, TPG, and Syneren, and again chose to award contracts to the original 15 awardees. *Id.* at AR 33071-88. The Government notified the Court and the parties of this action on July 24, 2023.

- July 24, 2023—TPG filed its complaint in this action. Case No. 23-1139 ECF No. 1.

- July 24, 2023—Commerce issued notices of termination for convenience for all contracts awarded pursuant to SSDD-2—i.e., the July contract awards. ECF No. 77 at AR 33089-117.

- July 24, 2023—The Government filed a Notice of Corrective Action stating that the agency had taken corrective action and attaching related documents. ECF No. 20.

- July 24, 2023—The Court held its initial scheduling conference with the parties.

- August 18, 2023—Commerce issued new contracts to 15 awardees pursuant to SSDD-3 (the "August Contract Awards"). ECF No. 96 at AR 33119-35042.

- August 18, 2023—Commerce sent notices to unsuccessful offerors. *Id.* at AR 35043.

- August 18, 2023—Commerce sent written debriefings to CSI, Ekagra, JCS, TPG, and Syneren. *Id.* at AR 35311-88.

On this background, the Court must determine whether the July or August Contract Award represents the final agency action that is properly before the Court.

### 1.   Commerce chose to consider the contract award decision afresh.

According to the Government, the answer is simple: the August Contract Awards are the only operative agency action for the Court to review. When the "agency has taken corrective action that resulted in a new evaluation and source selection decision, the court must review the agency's new decision." *Nat'l Air Cargo Grp., Inc. v. United States*, 127 Fed. Cl. 707, 717 (2016) (citing *Tenica & Assocs., LLC v. United States*, 123 Fed. Cl. 166, 171 (2015)). Several plaintiffs disagree.

Syneren first contends that the Supreme Court's holding in *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), prohibits an agency from unilaterally taking corrective action while a protest is pending. *Regents* dealt with the Department of Homeland Security's ("DHS") decision to end the Deferred Action for Childhood Arrivals, or "DACA," program. In several lawsuits the district courts held that the decision to end DACA was arbitrary and capricious. When the cases reached the Supreme Court, it explained that when a court finds an agency action inadequately explained, there are two options. "First, the agency can offer 'a fuller explanation of the agency's reasoning *at the time of the*

*agency action.*'" *Id*. at 1907–08 (2020) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990)) (emphasis in original).  This approach comes with an important limitation: "the agency may elaborate later on that reason (or reasons) but may not provide new ones." *Id*. at 1908 (citation omitted).  There is, however, a second choice: "the agency can 'deal with the problem afresh' by taking new agency action." *Id*. (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947)).  When an agency undertakes a new agency action, it "is not limited to its prior reasons but must comply with the procedural requirements for new agency action." *Id*.

Several terms after *Regents*, the Supreme Court revisited APA review in another immigration policy case, *Biden v. Texas*, 142 S. Ct. 2528 (2022).  In *Biden*, DHS decided to end its policy of returning to Mexico the non-Mexican aliens that crossed the southern border into this country.  When Texas and other states challenged this decision under the APA, the district court vacated DHS's decision to end the policy, remanded for further consideration, and entered a nationwide injunction ordering the Government to faithfully continue the return policy until lawfully rescinded. *Id*. at 2536.  After the district court, Fifth Circuit, and Supreme Court all denied a stay of the district court's order, the appeal proceeded in the Fifth Circuit. *See id*. at 2537.  During the Fifth Circuit appeal, Secretary Mayorkas chose to "consider[] anew whether to maintain, terminate, or modify" the return policy. *Id*.  He subsequently "announced his 'inten[tion] to issue in the coming weeks a new memorandum terminating'" the return policy. *Id*. (quoting *Texas v. Biden*, 40 F.4th 928, 654 (5th Cir. 2021)).  After the circuit denied a motion to hold the appeal in abeyance, the Secretary issued his new decision terminating the return policy.  The Fifth Circuit concluded that this new decision simply explained the prior decision and, therefore, was not a new agency action but an improper *post hoc* rationalization.  The Supreme Court reversed, explaining that "[t]he prohibition on post hoc rationalization applies only when the agency proceeds by the first option from *Regents*." *Id*. at 2546.

With that understanding of *Regents* options one and two as clarified by *Biden*, the Court turns to the parties' arguments.  According to Syneren, *Regents* means that the Agency may not "render[] a new decision to support its actions in the heat of litigation."  ECF No. 103 at 35.  But that is the precise rationale that the Supreme Court rejected in *Biden*.  The Supreme Court made clear that *Biden* was a *Regents* option two case, and the charge of *post hoc* rationalization had no place.  It also explained that the new decision made during the active litigation before the Fifth Circuit was a final agency action because it "mark[ed] the 'consummation' of the agency's decisionmaking process' and resulted in 'rights and obligations [being] determined.'" *Biden*, 142 S. Ct. at 2545 (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).  The same is true here.

The record clearly establishes that in SSDD-3, the SSA was considering the award decision afresh rather than attempting to explain the Commerce's prior award decision.  In fact, Commerce *terminated* each of the July Contracts awarded pursuant to SSDD-2, rendering that decision moot.  As the timeline above shows, Commerce also reconstituted the TET (to account for personnel leaving the agency) and the reconstituted TET re-evaluated the protestors' technical proposals.  The TET then issued a new report, TET Report-3.  The SSA then considered TET Report-3 and made a new award decision, SSDD-3.  Importantly, SSDD-3 does not attempt to explain SSDD-2; it replaces it with a new award decision based on TET Report-3, the past performance evaluations, and the price evaluations.  Commerce then sent notices and written debriefs to the protestors and awarded new contracts pursuant to SSDD-3.  Thus, the

August Contract Awards pursuant SSDD-3 are the final agency action before the Court. *Biden*, 142 S. Ct. at 2545.

These facts readily distinguish this case from those plaintiffs rely upon. For example, plaintiffs rely on the GAO's decision in *Boeing Sikorsky Aircraft Support*, B-277263 (Sept. 29, 1997), for the proposition that "reevaluations and redeterminations prepared in the heat of an adversarial process . . . may not represent the fair and considered judgment of the agency, which is a prerequisite of a rational evaluation and source selection process." *Id.* at *11. Although it predated *Regents*, *Boeing Sikorsky* was unquestionably a *Regents* option one case because the agency did not return to the drawing board, but rather sought to further defend its original decision. In *Boeing Sikorsky*, the agency provided a new evaluation from the SSA that stated that even if the protestor were correct on its challenges the outcome would be the same, therefore there could be no prejudice. The GAO rejected this approach because:

> As pointed out above, the agency does not acknowledge that it erred. Rather, we are faced with an agency's efforts to defend, in the face of a bid protest, its prior source selection through submission of new analyses, which the agency itself views as merely hypothetical and which are based on information that the agency continues to argue is not accurate. The lesser weight that we accord these post-protest documents reflects the concern that, because they constitute reevaluations and redeterminations prepared in the heat of an adversarial process, they may not represent the fair and considered judgment of the agency, which is a prerequisite of a rational evaluation and source selection process.

*Id.* at *11. That is not the case here. Again, Commerce terminated the July Contract Awards entirely, reconvened the TET, and issued a new technical evaluation that the SSA considered to make a new award decision in SSDD-3. Thus, *Boeing Sikorsky* does not help plaintiffs here.

Similarly unavailing is plaintiffs' reliance on *Centerra Group, LLC v. United States*, 138 Fed. Cl. 407 (2018). In *Centerra*, the Court granted the government's request for a remand so that it could further consider its contract award decision. During that remand, however, the agency held discussions only with the awardee. The protestor was not "allowed to communicate any clarifications or revisions of its proposal." 138 Fed. Cl. at 416. That is not the case here. Commerce re-evaluated each technical proposal and made a new decision without any unfair conduct like that in *Centerra*. Therefore, *Centerra* does not support plaintiffs' claim that the corrective action was improper.

### 2.   Commerce did not cut procedural corners in the corrective action.

Having found that Commerce's Corrective Action is properly before the Court, the Court must address whether Commerce cut any procedural corners in issuing the new award decision. As explained above, the agency terminated prior contract awards, reconstituted the TET, generated a new TET Report, which the SSA considered in accord with the RFP, and then the SSA issued a new award decision. The Agency then provided the written notices and debriefings

to the disappointed bidders.  In short, the Agency jumped through the hoops of making a new award decision.  Plaintiffs raise several arguments that the Court addresses in turn.

Syneren and CSI argue that Commerce's taking corrective action without seeking a remand violates RCFC 52.2, which provides that "[i]n any case within its jurisdiction, the court, on motion or on its own, may order the remand of appropriate matters to an administrative or executive body or official."  RCFC 52.2(a).  According to Syneren, if an agency wants to take corrective action it has only two choices, it may either take corrective action that moots the entire case and move to dismiss or seek a voluntary remand under Rule 52.2.  Because Commerce chose not to moot the entire protest, these plaintiffs argue that it violated RCFC 52.2 by taking corrective action without a voluntary remand.  In Syneren's words, "[a] voluntary remand is the *only* mechanism through which an agency may seek to undertake a voluntary re-evaluation while a bid protest action remains pending, and it requires leave of this Court and the agency's demonstration that the request for remand is 'substantial and legitimate.'"  ECF No. 103 at 37 (quoting *Keltner v. United States*, 148 Fed. Cl. 552, 563-64 (2020)) (emphasis in original).  The glaring problem with this argument is a textual one—Rule 52.2 addresses what this *Court* can do; it says absolutely nothing about what an *agency* can do.

Nor is it correct that an agency *must* seek remand to reconsider an award decision.  The Federal Circuit explained the various options an agency has when its decision is before the Court in *SKF USA, Inc. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001).  In *SKF*, the Circuit explained that when the agency seeks to reconsider its decision, it should generally seek a remand for that purpose.  254 F.3d at 1029.  In its explanation, the Federal Circuit quotes with approval the D.C. Circuit's opinion in *Anchor Line Ltd. v. Federal Maritime Commission*, 299 F.2d 124 (D.C. Cir. 1962).  In *Anchor Line*, the D.C. Circuit rejected the argument that a pending court action deprived the agency of the ability to reconsider its action.  Specifically, the Circuit held that "the pendency of a review petition does not automatically bar reopening of an administrative proceeding."  *Id.* at 125 (citations omitted).  Thus, the Court cannot say that the government must seek remand before taking corrective action in this case.

Nor has Syneren alleged any prejudice from the corrective action without a remand in this case.  In *Anchor Line*, the D.C. Circuit explained that unless the reconsideration without remand is somehow prejudicial, it would not disturb it.  *Id*.  Brightpoint makes the same argument here.  ECF No. 122 at 5 ("What is missing from the protesters' arguments, however, is any proof of the competitive prejudice necessary for such an allegation to support an injunction.") (citation omitted).  Indeed, plaintiffs have failed to identify any prejudice that flowed from the fact that there was no remand here.  Rather, it appears clear that their disagreements with SSDD-3 would be the same whether there had been a remand or not.

Several plaintiffs contend that the agency's re-evaluation was too brief.  But that is not something that is apparent from the record.  In *Allicent*, the Court found a total of 23 Significant Weaknesses assigned to Ekagra, Syneren, CSI, and JCS to have been arbitrary and capricious.  TPG had a total of three Significant Weaknesses.  *Allicent* required the agency, if it chose to go forward with the CATTS procurement, to reevaluate the four technical proposals at issue (recall that TPG did not participate in *Allicent*) in a manner not inconsistent with *Allicent*.  Thus, all the TET needed to consider were the 26 discrete evaluations of responses to specific PWS sections to comply with *Allicent*.  Because it is not clear that such a re-evaluation could not take place in a

few days, the Court does not consider the length of time it took the agency to conduct the corrective action to be unreasonably short.

Syneren and JCS also contend that Commerce failed to reconvene the TET and SSEB as required in the Source Selection Plan. In response, the Government points to the Court's decision on the motion to supplement the record in this case where the Court found that the record clearly established the TET reconvened through videoconference and revaluated proposals. ECF No. 113 at 40. JCS does not mention the SSEB in its reply. Syneren contends that this reconvening is "beside the point" because the record does not show they reconvened to generate TET-2. ECF No. 118 at 11. But it is the *entire* point that the agency reconvened the reviewers and they reevaluated the proposals in generating TET Report-3.

Many plaintiffs also argue that the corrective action was not really a re-evaluation, but rather simply an effort to better document the same decision. In other words, these plaintiffs contend that the agency undertook the corrective action with closed minds. They find it too coincidental that the Agency came to the same evaluations that the Government argued in *Allicent*. But that is no surprise here. In *Allicent*, the Government argued that many of the offerors failed to provide sufficient information in their proposals about a given requirement when the evaluation stated the offeror failed to address that requirement. As the Supreme Court explained in *Biden*, it is not enough to complain that the reconsideration came to the same conclusion as the prior agency action. In other words, plaintiffs cannot establish "closemindedness based on an identity between proposed and final agency action." *Biden*, 142 S. Ct. at 2534 (citing *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2385 (2020)). And here, the Agency did change its evaluations of various proposals in the re-evaluation and corrective action. For example, the TET's re-evaluation of CSI's proposal resulted in one significant weakness being changed to a weakness. ECF No. 77 at AR 33074. Thus, plaintiffs fail to show that the agency approached the re-evaluation with a closed mind because "[i]t is black-letter law that an agency that takes superseding action on remand is entitled to 'reexamine[ ] the problem, recast its rationale and reach[ ] the same result.'" *Id*. at 2547 (quoting Chenery, 332 U.S. at 196)).

For these reasons, the evaluations in the corrective action—TET Report-3, SSDD-3, etc.—are the decisions before the Court and the focus of the Court's analyses.

**B.      Neither Syneren, Ekagra, nor JCS Solutions can establish prejudice.**

The Government moves for judgment against Syneren, Ekagra, and NCS Solutions because they cannot establish prejudice, which is required in every bid protest. ECF No. 113 at 26-29. Plaintiffs showing a substantial error in the agency's evaluation is not enough; they must also demonstrate that absent the error they had a "substantial chance" of award. *E.g., Glenn Defense*, 720 F.3d at 912. Here, the Government's argument is straightforward—the SSA determined that the Significant Weaknesses that this Court held in *Allicent* were rationally assigned to Ekagra, JCS, and Syneren (the "*Allicent* Significant Weaknesses") were sufficient *on their own* to render these proposals unawardable under the RFP. Thus, even if there were error in the re-evaluation of these proposals, such error could not be prejudicial because the *Allicent* Significant Weaknesses alone still render the proposals unawardable. In SSDD-3, the SSA concluded that as to:

- Ekagra – "The significant weaknesses found by COFC to be rationally assigned are numerous and pervasive enough for DOC to conclude that the Offeror's technical proposal is Unacceptable, and that the Offeror is therefore ineligible for award regardless of price or other factors. For these reasons, even if COFC were to hold that DOC made errors in its re-evaluation, and even if DOC removed the re-evaluated significant weaknesses and weaknesses from DOC's analysis, DOC still would make the same decision to not make an award to Ekagra Partners." ECF No. 77 at AR 33077-78.

- JCS – "Moreover, the critical flaws in the Offeror's proposal are so significant that even if DOC had not assessed the one significant weakness that was found by COFC to be arbitrary and capricious, the offeror's proposal would still be so flawed as to be unawardable. The significant weaknesses found by COFC to be rationally assigned (PWS areas 3.3.4, 3.4.2, 3.4.4, 3.4.6, 3.4.7, 3.4.8, 3.4.10, 3.4.11, 3.4.12, 3.4.16, 3.4.18, 3.4.19, and 3.4.20), by themselves, represent an unacceptable risk of unsuccessful contract performance. The serious impact of these numerous significant weaknesses outweigh any strengths contained in the proposal, and these significant weaknesses indicate that the Offeror has not demonstrated an understanding of or has failed to meet the Government's minimum requirements. In particular, the 12 significant weaknesses found in PWS Task Area 4 pose unacceptable operational risks to DOC. The significant weaknesses found by COFC to be rationally assigned are numerous and pervasive enough for DOC to conclude that the Offeror's technical proposal is Unacceptable, and that the Offeror is therefore ineligible for award regardless of price or other factors. For these reasons, even if COFC were to hold that DOC made errors in its re-evaluation, and even if DOC removed the re-evaluated significant weaknesses from DOC's analysis, DOC still would make the same decision to not make an award to JCS Solutions." *Id*. at AR 33080.

- Syneren – "Moreover, the critical flaws in the Offeror's proposal are so significant that even if DOC had not assessed the two significant weaknesses that were found by COFC to be arbitrary and capricious, the offeror's proposal would still be so flawed as to be unawardable. The significant weaknesses found by COFC to be rationally assigned (PWS areas 3.3.1, 3.3.3, 3.4.17 and 3.6.1), by themselves, represent an unacceptable risk of unsuccessful contract performance. The serious impact of these numerous significant weaknesses outweigh any strengths contained in the proposal, and these significant weaknesses indicate that the Offeror has not demonstrated an understanding of or has failed to meet the Government's minimum requirements. In particular, the significant weaknesses found in PWS areas 3.4.17 (Wireless and Mobile Device Support) and 3.6.1 (Cybersecurity and Information Assurance) pose unacceptable operational and security risks to DOC. The significant weaknesses found by COFC to be rationally assigned are numerous and pervasive enough for DOC to conclude that the Offeror's technical proposal is Unacceptable, and that the Offeror is therefore ineligible for award regardless of price or other factors. For these reasons, even if COFC were to hold that DOC made errors in its re-evaluation, and even if DOC removed the re-evaluated significant weaknesses from DOC's analysis, DOC still

would make the same decision to not make an award to Syneren Technologies." *Id*. at AR 33082-83.

Given the SSA's determinations, unless Ekagra, JCS, or Syneren can demonstrate that these conclusions are arbitrary, capricious, or otherwise contrary to law, they cannot prevail on their protests regardless of any error in the Agency's re-evaluation. This Court is not persuaded by their challenges to the SSA's determination.

Syneren and JCS argue that the Agency's conclusion that the *Allicent* Significant Weaknesses alone render their proposals unawardable is precluded by *Allicent* itself. Here the arguments rely on *Allicent*'s discussion of prejudice for plaintiffs whose proposals Commerce rated as Unsatisfactory due to "'a combination of Significant Weaknesses that represents a material failure to meet requirements. Represents a high or unacceptable risk of unsuccessful contract performance.'" *Allicent*, 166 Fed. Cl. at 144 (quoting ECF No. 68[5] at AR 1512). In *Allicent*, the issue the Court was addressing was how many Significant Weaknesses a plaintiff must successfully challenge before that plaintiff could demonstrate a significant likelihood of award – i.e., prejudice. The Court concluded that the determination of whether a given subset of Significant Weaknesses remained an unacceptable risk to the Agency was "unquestionably" a question for the Agency rather than the Court. *Id*. And the Government agreed that if a plaintiff succeeded in demonstrating that any Significant Weakness was arbitrarily or capriciously assigned, the Court had to send the issue back to the agency for it to determine whether the proposal remained unacceptable. *Id*. In other words, because the plaintiffs were found Unacceptable due to the combination of Significant Weaknesses, all a plaintiff needed to do to establish prejudice in *Allicent* was prevail on a challenge to one Significant Weakness.

Relying on this holding, Syneren argues that the government cannot now contend that the *Allicent* Significant Weaknesses alone render its proposal Unacceptable. Rather, Syneren argues that *Allicent*'s holding that prevailing on any challenge to a Significant Weakness establishes prejudicial error is binding as law of the case. ECF No. 118 at 28-29. It also argues that the Government itself conceded this point in *Allicent* and is bound by its concession. *Id*.

Law of the case is not a great fit for Syneren's argument because this Court has not made any determination about what plaintiffs need to do to establish prejudice *in this case*. "The law of the case is a judicially created doctrine aimed at preventing the relitigation of issues." *Goodeagle v. United States*, 128 Fed. Cl. 642, 648 (2016) (citing *Jamesbury Corp. v. Litton Indus. Prod., Inc.*, 839 F.2d 1544, 1550 (Fed. Cir. 1988), overruled on other grounds, *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020 (Fed. Cir. 1992)). The law of the case doctrine "'requires a court to follow the decision of a question made previously *during the case*.'" *Id*. (quoting *Jamesbury*, 839 F.2d at 1550) (emphasis added). But Syneren asks the Court to apply law of the case to a decision from *Allicent*, not this case. Such preclusion, however, seeks to apply *res judicata*, not law of the case. Law of the case and *res judicata* "are related, but not identical. *Res judicata* bars the relitigation of issues in *subsequent* litigation, while the law of the case directs a court's discretion in the *same* litigation." *McGuire v. United States*, 97 Fed. Cl. 425, 434 (2011) (citing *S. Ry. Co. v. Clift*, 260 U.S. 316, 319 (1922))

---

[5] In *Allicent*, this section of the administrative record appeared at ECF No. 118. The Court changes the citation here for ease of reference.

(emphasis in original).  While *Allicent* and this case relate to the same procurement, this case is undeniably subsequent litigation under *McGuire* and *Clift* because it addresses a subsequent agency evaluation based on allegations made in new complaints.  Even if the Court were to apply law of the case to *Allicent*'s holding, it would not preclude this Court from addressing the prejudice question anew based on the new set of facts before the Court.  *E.g.*, *C.W. Over & Sons, Inc. v. United States*, 48 Fed. Cl. 342, 347 (2000) (denying law of the case arguments because of subsequent factual development).  Therefore, law of the case does not mandate that the Court find prejudice here based on a plaintiff's success challenging any Significant Weakness.

JCS makes a similar argument that *Allicent*'s holding that success in challenging any one Significant Weakness establishes prejudice may not be litigated here because of claim preclusion.  ECF No. 119 at 6-7.  *Res judicata* includes two related doctrines—claim preclusion and issue preclusion.  Claim preclusion applies "if: (1) there is identity of parties (or their privies); (2) there has been an earlier final judgment on the merits of a claim; and (3) the second claim is based on the same set of transactional facts as the first."  *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1362 (Fed. Cir. 2000).  Here, the first two elements are satisfied, which the government concedes.  ECF No. 127 at 5-6.  Thus, the question is whether this case and *Allicent* are based on the same set of transactional facts.  They are not.  *Allicent* was based on a prior evaluation of proposals under this procurement, one that did not address whether the *Allicent* Significant Weaknesses alone rendered a proposal Unacceptable.  This case, however, deals with a later evaluation that does address that question.[6]  As the Federal Circuit has explained "[c]laim preclusion, where it applies, prevents litigation of 'all grounds for, or defenses to, recovery that *were previously available to the parties*, regardless of whether they were asserted or determined in the prior proceeding.'"  *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 719 F.3d 1367, 1371 (Fed. Cir. 2013) (quoting *Brown v. Felsen*, 442 U.S. 127, 131 (1979)) (emphasis added).  Because arguments based on the new evaluation were unquestionably not available to the government in *Allicent*, which was decided before the new evaluation even took place, this case presents new transactional facts that preclude the application of claim preclusion.  *See, e.g.*, *Avant Assessment, LLC v. United States*, 159 Fed. Cl. 632, 640-41 (2022) (denying a motion to dismiss for claim preclusion based on facts learned after the prior litigation was filed); *Hyperion, Inc. v. United States*, 120 Fed. Cl. 504, 511 (2015) (rejecting claim preclusion because

---

[6] Although JCS argues claim preclusion, it appears its argument would be more properly addressed as issue preclusion because JCS appears to be arguing that the Court's decision that success in challenging any Significant Weakness establishes prejudice, an issue litigated in *Allicent*, precludes the government's argument here.  Issue preclusion applies when: "(1) [there is] identity of the issues in a prior proceeding; (2) the issues were actually litigated; (3) the determination of the issues was necessary to the resulting judgment; and (4) the party defending against preclusion had a full and fair opportunity to litigate the issues."  *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 719 F.3d 1367, 1371 (Fed. Cir. 2013) (citation omitted).  Issue preclusion fails for the same reason as claim preclusion—i.e., *Allicent* dealt with a different agency action that did not address whether a the *Allicent* Significant Weaknesses alone render a proposal Unacceptable.  The evaluation in this case, however, does make such a determination.  Thus, there is no identity of the issues between *Allicent* and this case, meaning that issue preclusion would not apply either.

"subsequent events that occurred following the court's judgment have created new transactional facts requiring reevaluation").

Therefore, neither law of the case nor claim preclusion prevent the government from arguing, nor the Court from holding, that the *Allicent* Significant Weaknesses alone render proposals Unsatisfactory.  Indeed, *Allicent* made clear that such a determination was "unquestionably" one for the agency, not the Court, to make.  The plaintiffs should not be surprised that the agency has done so.

Ekagra argues that "[t]he Agency does not explain *why* [the *Allicent* Significant Weaknesses] contribute to an Unsatisfactory rating and in its flawed attempt to do so, points to security concerns under two significant weaknesses."  ECF No. 101 at 24 (emphasis in original).  The SSA concluded that the *Allicent* Significant Weaknesses "by themselves, represent an unacceptable risk of unsuccessful contract performance.  The serious impact of these numerous significant weaknesses outweigh any significant strengths and strengths contained in the proposal."  ECF No. 77 at AR 33077.  In plain terms, the SSA considered and balanced the benefits of Strengths and Significant Strengths in the proposal against the Significant Weaknesses.  That balance is within the agency's discretion to make.  Commerce considered the Strengths that Ekagra contends contradict the finding and reached a different conclusion.  This Court does not find any basis to disturb it.

### C.     There was no breach of the duty of good faith and fair dealing.

Several plaintiffs contend that Commerce breached the duty of good faith and fair dealing through its re-evaluation of their proposals.  "The standard applied by the court to a claim that the government has breached its duty to fairly and honestly consider a proposal is the same 'arbitrary and capricious' standard applied to other protest grounds under the APA."  *Innovative Test Asset Sols. LLC v. United States*, 125 Fed. Cl. 201, 217 (2016) (citations omitted).  They essentially contend that Commerce did not evaluate their proposals fairly or with an open mind; rather, they contend that Commerce simply engaged in a process to paper over the award decision and reach the same conclusion as before.  As explained above, however, the agency followed the Court's decision in *Allicent*, its re-evaluation of proposals was permissible, and the decision rational.  In the end, the Court does not find that the agency's re-evaluation, which complied with the law, breached a duty of good faith and fair dealing.

### D.     Commerce rationally evaluated CSI's proposal.

Unlike Syneren, Ekagra, and JCS, Commerce did not conclude that the *Allicent* Significant Weaknesses alone render CSI's technical proposal Unsatisfactory.  Therefore, the Court considers CSI's evaluation on the merits.[7]

---

[7] CSI also challenged Commerce's ability to take unilateral corrective action based on the same arguments addressed above.  The Court's resolution of that issue above applies to CSI's arguments as well.

      1.     <u>Commerce performed an actual re-evaluation of proposals that was not inconsistent with *Allicent*.</u>

CSI argues that Commerce acted arbitrarily and capriciously by failing to follow *Allicent*. ECF No. 102-1 at 20-23. According to CSI, this "court did not remand to the Agency to provide a fuller explanation but ordered the Agency perform new technical evaluations." ECF No. 102-1 at 20. CSI contends that Commerce did not conduct an actual re-evaluation but simply regurgitated what the government argued in *Allicent*. CSI believes this failure is evident in the fact that the only technical changes that the agency made in its new evaluation dealt with the Significant Weaknesses that this Court held to have been arbitrary and capricious in *Allicent*, while the agency carried forward the other evaluations verbatim.

As an initial matter, it is not correct to state that this Court remanded anything in *Allicent*. In fact, the word "remand" does not appear once in the 100-plus pages *Allicent* occupies in the Court's reporter. *Allicent* enjoined Commerce from moving forward with the procurement because certain evaluations were arbitrary and capricious. As discussed more below, all *Allicent* held was that if Commerce wanted to award contracts pursuant to the CATTS RFP, it would have to re-evaluate certain technical proposals in a way that was not inconsistent with that decision. That is not a remand.

That said, CSI's argument that Commerce only re-evaluated the *Allicent* Significant Weaknesses and did not undertake a substantive re-evaluation fails to establish an arbitrary or capricious re-evaluation. Commerce re-evaluated CSI's proposal after *Allicent* and made substantive changes. *See* ECF No. 102-1 at 22 (citing ECF No. 77 at AR 30430). More importantly, all *Allicent* required was that a technical re-evaluation, if Commerce chose to undertake one, be conducted "in a manner not inconsistent with" that opinion:

> If the Government wishes to proceed with this procurement, it shall, at a minimum, re-evaluate the technical proposals of Ekagra, CAN Softtech, Syneren, and JCS Solutions and issue new decision documents as necessary in a manner not inconsistent with this Opinion and Order. The Government shall then make new contract award decisions and award new contracts as necessary.

166 Fed. Cl. at 189. Adhering to evaluations this Court already held to be rational in *Allicent* is not inconsistent with *Allicent*. Nor does the Court find the choice to adhere to the evaluations that CSI did not challenge in *Allicent* to be a problem.

      2.     <u>Commerce rationally evaluated CSI's technical proposal.</u>

Before considering the merits of CSI's challenge to the agency's re-evaluation of its proposal, the Court must resolve the government's argument that CSI waived its challenges to the re-evaluation. According to the Government, CSI challenges only the moot second evaluation and says nothing about the reevaluation, meaning that CSI has not challenged anything about the current evaluation and waived any other arguments. ECF No. 113 at 57. It is true that CSI only argues that the re-evaluation was arbitrary and capricious and never mentions

the corrective action in its MJAR briefing.  *See* ECF No. 102-1 at 26-34.  But that does not necessarily mean that CSI has waived the arguments.

When the "agency has taken corrective action that resulted in a new evaluation and source selection decision, the court must review the agency's new decision."  *Nat'l Air Cargo Grp., Inc. v. United States*, 127 Fed. Cl. 707, 717 (2016) (citing *Tenica & Assocs., LLC v. United States*, 123 Fed. Cl. 166, 171 (2015)).  And following such corrective action, the challenges to the prior decision are moot.  *Id.*  But *National Air Cargo* recognizes an exception when the challenged decision is not cured by the corrective action.  In those cases, the "initial . . . decision will continue to present a live controversy to the extent errors in the original evaluation have gone unresolved during corrective action . . . ."  *Id.* (citing *Croman Corp. v. United States*, 106 Fed. Cl. 198, 213 (2012)).  This exception applies here to the extent Commerce simply carried the same evaluation from the second evaluation through the reevaluation.  And a review of the evaluations show that Commerce did not materially change its challenged evaluations of CSI's proposal from the re-evaluation in the corrective action, so CSI's challenges are not moot.

<em>a)      Significant Weakness – PWS Section 3.4.7.</em>

PWS 3.4.7 requires contractors "to support the provisioning of storage services across all virtual and physical environments, to include but not limited to, administration and management support, backup, disaster recovery, emergency response, and Continuity of Operations (COOP)." ECF No. 77 at AR 29560.  In the corrective action, Commerce assigned a Significant Weakness because it concluded that CSI "provided a list of tasks but lacked sufficient information to demonstrate an approach and capability to support the requirements."  *Id.* at AR 33028.  This evaluation continues to discuss the list of tasks that CSI proposed and concluded that "[t]he Offeror's list of tasks did not provide sufficient information on the Offeror's approach and capabilities to meet requirements, because the Offeror did not state what proven, innovative methods it would use to meet the tasks, as required by the RFP."  *Id.*

CSI insists that it did provide an innovative approach by listing the industry best practices and the "innovative" methods that it would apply to the contract.  ECF No. 102-1 at 28.  Thus, according to CSI, "the tasks listed by CSI are concrete and are specific enough themselves that they do not need a detailed explanation for the Agency to understand what CSI was proposing to do."  *Id.*  This argument necessarily fails because it is nothing more than a mere disagreement with the evaluation by Commerce.  *E.g.*, *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004) ("Such naked claims, no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious.") (citation omitted).

In the end, *Allicent* held the initial evaluation arbitrary and capricious because it faulted CSI for failing to provide an approach and then defended that evaluation as a lack of specificity. Here, Commerce has re-evaluated CSI's proposal and concluded that its response to PWS 3.4.7 lacks sufficient detail to demonstrate a capability to support the requirements.  ECF No. 77 at AR 33028.  Although CSI complains that the RFP lacks any indication of how much specificity is required, that argument also fails because the RFP explicitly provides that offerors must submit a "detailed technical approach to performing the work in the Final CATTS PWS."  ECF No. 68 at

AR 1479, 1490.  And one part of Commerce's evaluation of that detailed technical approach was whether it "demonstrate[d] the Offeror's ability to meet or exceed the Final CATTS PWS requirements and deliverables."  *Id*.  Commerce concluded that CSI failed to do so, and that determination is entitled to significant deference.  *KSC Boss All., LLC v. United States*, 142 Fed. Cl. 368, 380-81 (2019) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)).  If CSI were confused about the amount of detail needed, it needed to challenge that before now.  *E.g.*, *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007) ("Accordingly, a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims.").

Therefore, CSI's challenge to the Significant Weakness for PWS 3.4.7 fails.

> b)    3.4.8

PWS Section 3.4.8 requires the contractor "to provide Cloud PaaS capabilities to customers seeking to deploy into a native cloud infrastructure.  The contractor is expected to manage and control the underlying native cloud infrastructure including network, servers, virtualization and containerization platforms, operating systems, storage, and platform software and services."  ECF No. 77 at AR 29560-61.  Commerce assigned a Significant Weakness to CSI's proposal because it "provided a list of tasks that lacked sufficient information to demonstrate their approach and capability to support the requirements."  ECF No. 77 at AR 33028.  The TET quoted CSI's proposal where it states that it will "'analyze application requirements to recommend resources needed for infrastructure, servers, storage, networking, firewall security, development tools, BI services database management, and more.'"  *Id*. (quoting ECF No. 68 at AR 6662).  The TET concluded that this does not explain the types of recommendations CSI makes or how it implements them, thus failing to demonstrate its capability to perform the PWS requirements.  *Id*. at AR 33029.  CSI insists that its proposal clearly identifies the types of recommendations it proposed to make, arguing that the proposal states "CSI will provide recommendations regarding 'provisioning, instantiating, running, building a full container application platform, integrating elements such as persistent storage, networking, service mesh, perform CI/CD, monitoring and extending to new models (i.e., serverless computing)."  ECF No. 102-1 at 29-30 (quoting ECF No. 69 at AR 6662).  But CSI's proposal does not say that its recommendations regard that list of items; it states that "[o]ur support provides insight into" that list of items.  ECF No. 69 at AR 6662.  Therefore, the agency's interpretation is rational.

Similarly, the TET recognized CSI's representation that its "support provides insight into provisioning, instantiating, running, building a full container application platform, integrating elements such as persistent storage, networking, service mesh, perform CI/CD, monitoring and extending to new models (i.e., serverless computing)."  ECF No. 77 at AR 33029 (quoting ECF No. 69 at AR 6662)).  But here too the TET found that CSI's proposal did not explain what these insights will accomplish or how they will be utilized to perform the PWS requirements.  *Id*.  Again, CSI insists that its proposal is clear.  But Commerce's reading of CSI's proposal is reasonable and, therefore, its evaluation is rational.

Therefore, the Court denies the challenge to Commerce's assessing a Significant Weakness for PWS Section 3.4.8.

> c)    3.4.10

PWS Section 3.4.10 requires the contractor to "provide enterprise infrastructure maintenance and repair support." ECF No. 77 at AR 29561-62. Commerce assessed this Weakness[8] because it found CSI failed to "provide sufficient information to demonstrate an approach and capability to accomplish enterprise structure maintenance and repair." ECF No. 77 at AR 33026. Commerce found that the mere statement by CSI that it would "adhere to a list of processes . . . and work with the customer to determine service for maintenance and repair procedures" fell short of "demonstrat[ing] capability to support these requirements." *Id*.

CSI contends that it provided sufficient information when it proposed performing these processes in accordance with a defined Service Level Agreement, based on a widely accepted IT service delivery network, the Information Technology Infrastructure Library ("ITIL"). According to CSI, sufficient capability is demonstrated by its commitment to this Service Level Agreement—consisting of industry-wide best practices and standardization methodologies specified by ITIL—as well as the ITIL certification of CSI's personnel. ECF No. 102-1 at 31–32. Thus, CSI argues it did provide adequate means to assure Commerce that CSI would accord its performance to widely accepted industry standards. *Id*. at 32.

But the Weakness identified by Commerce was that it failed to demonstrate capability, and Commerce provided several examples of information not provided by CSI. ECF No. 77 at AR 33026. Indeed, the TET quoted much of the language that CSI refers to, clearly demonstrating that the TET considered it. Further, the TET found that "did not provide information on how they would respond to hardware related incidents, how warranty actions will be coordinated, what standards are utilized to determine which upgrades are recommended, how upgrades will be performed, what methodology would be used for technical diagnosis, etc." *Id*. A review of CSI's proposal does not objectively refute the TET's conclusions that this information is absent. Given the wide discretion the agency has to make technical evaluations, CSI's argument fails because the agency considered the information (indeed quoted much of the language CSI points to) and found it insufficient. CSI's mere disagreement with that assessment is insufficient. *Poplar Point*, 147 Fed. Cl. at 212 ("An offeror's disagreement with the agency's judgment, without more, is insufficient to establish that the agency acted unreasonably."). The TET's assessing a Weakness for PWS 3.4.10 was rational and supported by the record.

> d)    3.4.18

PWS Section 3.4.18 requires the contractor to "provide voice installation, operations, and maintenance services." ECF No. 77 at AR 30563. Commerce assessed a Significant Weakness to CSI's proposal because it found that it did not "provide sufficient information to define their approach as to how [tasks identified in the proposal] will be completed for provision of voice services." *Id*. at AR 33029–30. Commerce found that CS did not "state what proven, innovative methods they would use to meet the tasks, as required by the RFP," and that, therefore, "simply

---

[8] In the re-evaluation, Commerce changed this from a Significant Weakness to a Weakness.

stating they will complete these items is not an approach." *Id*. at AR 33030.  Commerce added that simple statements that the specifications will be complied with are "inadequate and unsatisfactory," as they demonstrate neither an approach nor capability. *Id*.

CSI reiterates a familiar challenge here, namely that its proposal provided sufficient information when it committed to following certain industry-wide best practices and international standards in which its personnel are qualified.  ECF No. 102-1 at 33.  But the TET found the mere statement of the intent to comply with standards—even those acknowledged across the industry—to be insufficient.  ECF No. 77 at AR 33030.  The RFP supports that evaluation.  *See* ECF No. 68 at AR 1474.  The TET's assessing a Significant Weakness for PWS 3.4.18 was rational and supported by the record.

> *e)*     *3.4.20*

PWS Section 3.4.20 requires the contractor to "provide a knowledge wall and video display integration, operations, and maintenance support."  ECF No. 77 at AR 29565.  Commerce assessed a Significant Weakness to CSI's proposal because it found CSI failed to provide required information and detail.  Thus, while the TET recognized that CSI's proposal stated that it had successfully designed systems in the past and would examine the uses of a knowledge wall to determine the best solution, CSI "did not provide information on how it will engineer and program video display systems.  Also, it did not provide information on how it will conduct the other requirements listed above, such as routine operations tests and fault isolation on video display systems." *Id*. at AR 33031.

CSI's challenge to this evaluation is simply that the evaluation is longer than the proposal section.  ECF No, 102-1 at 33.  It is not clear what makes the one paragraph evaluation arbitrary or capricious.  CSI argues that it shows Commerce was demanding an unreasonable amount of detail.  But the brevity of CSI's response only supports the TET's conclusion that "[t]he Offeror did not provide sufficient information to demonstrate an approach and capability to meet this requirement."  ECF No. 77 at AR 33031.

The TET's assessing a Significant Weakness for PWS 3.4.20 was rational and supported by the record.

> **E.     Commerce rationally evaluated TPG's proposal.**

Although TPG chose to sit out the *Allicent* protest in this Court,[9] it now protests the re-evaluation of its proposal.

> 1.     Waiver

TPG breaks its argument into two sections, one that deals with the initial evaluation from 2022, which was not changed following *Allicent*, ECF No. 99 at 10-18, and one that deals with

---

[9] TPG protested at the GAO but did not file in this Court after the GAO dismissed the related protests after *Allicent* filed here.  TPG protested the re-evaluation as well at the GAO and chose to file here after Syneren filed and the GAO dismissed its protest.

the corrective action, *id*. at 18-25.  Initially, the Government argued that TPG had waived all its arguments because the arguments about the initial evaluation are moot following the corrective action, which TPG never addressed in its complaint.  ECF No. 113 at 83-85.  The Court finds the challenges to the initial evaluation moot because the corrective action replaced the initial evaluation and made substantive changes.  *Compare* ECF No. 77 at AR 32971 (initial evaluation[10]), *with id*. at AR 33062-64 (TET Report-3).

The Government also argued that TPG could not challenge its re-evaluation in TET Report-3 because TPG's complaint makes no allegation regarding that evaluation.  During the oral argument, the Court asked if the parties would consent to try TPG's challenge to its corrective action evaluation by consent pursuant to RCFC 15(b)(2).  The Government was not receptive to that path but made clear it would not object to TPG filing an amended complaint.  Following oral argument, TPG amended its complaint to address the corrective action.  ECF No. 129.  As a result, the Government withdrew its waiver argument regarding TPG's challenge to the corrective action evaluation of its proposal.  ECF No. 130.[11]  Therefore, the Court turns to TPG's arguments regarding the Corrective Action.

> ### 2.    Commerce was not required to find responsive information in other parts of a proposal.

As discussed in detail below, a common thread of Commerce's assessing Significant Weaknesses to TPG's proposal is that TPG failed to provide enough information.  TPG responds that its "processes, methodologies, and tools to address PWS Subsections 3.4.19 and 3.4.20 are described in multiple places in its proposal."  ECF No. 99 at 19.  This raises an initial problem with TPG's argument—it points to a variety of disparate sections of its proposal to show that it complied with PWS 3.4.19.  TPG faults the Government for looking at statements in isolation and argues that "'principles of interpretation suggest that the Court should read the proposal as a whole in order to discern the meaning of any individual parts.'"  ECF No. 116 at 13 (quoting *IBM Corp. v. United States*, 119 Fed. Cl. 145, 157 (2014)) (internal citation omitted).

While that is clearly a general principle for interpreting proposals that guides the Court, it yields to the specific language of this RFP.  This issue came up repeatedly in *Allicent*, in which the Court recognized that "the RFP instructed offerors to cross-reference other sections if they provided information in other sections of the proposal."  *Allicent*, 166 Fed. Cl. at 109.[12]  Specifically, the RFP instructs: "<u>Cross-references should be utilized to preclude unnecessary duplication of data between sections.</u>"  ECF No. 68 at AR 1472 (emphasis in original).  And the

---

[10] Because TPG did not participate in *Allicent*, the agency did not re-evaluate its proposal in response to *Allicent*.  The initial technical proposal evaluation that Commerce prepared before *Allicent* was therefore sent to TPG as its debriefing from the re-evaluation.

[11] For the avoidance of doubt, the Government limited its withdrawal to only its argument regarding TPG's challenge to the corrective action evaluation of its proposal.  The Government expressly preserved all other waiver arguments.

[12] Because TPG did not participate in *Allicent*, the Court does not apply it here under any form of *res judicata*.  Rather, the Court follows *Allicent* as persuasive and TPG has not provided any reason to depart from its holdings about this RFP and procurement.

RFP made clear that the failure to follow the RFP's instructions "will be at the Offeror's own risk." *Id.* at AR 1474. Based on these instructions, this Court rejected many plaintiffs' arguments in *Allicent* that a proposal contained the necessary information when that information was in sections responding to other PWS sections than the one at issue. This was because Commerce was not required to search out responsive information from other parts of a proposal. *E.g.*, *Vanguard Recovery Assistance v. United States*, 101 Fed. Cl. 765, 786-87 (2011) (Commerce was "not obligated to go to unrelated sections of the proposal in search of needed information which the offeror has omitted or failed adequately to present"); *see also Allicent*, 166 Fed. Cl. at 150 ("The Court will not fault the Agency for not piecing together a response to requirements from different sections of the proposal relating to different PWS Sections when there is not a cross-reference."). The Court applies the same rule here and does not fault the Agency for not piecing together a response to PWS 3.4.19 or 3.4.20 from all over TPG's proposal. If TPG wanted to ensure the Government considered those responses to other PWS Sections, the RFP instructed them how to do so—with a cross-reference.

      3.    <u>3.4.19</u>

Commerce assessed a Significant Weakness for TPG's proposal for PWS 3.4.19, which requires "the Offeror to provide video and Video Teleconferencing (VTC) installation, operations, and maintenance services." ECF No.77 at AR 29564-65. After summarizing the PWS 3.4.19 requirements, Commerce provided its rationale for assessing the Significant Weakness in three paragraphs. TPG addresses each paragraph separately as individual "alleged weaknesses" and the Government addresses its arguments to each separate "alleged weakness" section of TPG's MJAR. Although TPG refers to these subsections as separate "alleged weaknesses," the record is clear that these three paragraphs explain the assessment of one Significant Weakness. *Id.* at AR 33062-63.[13] Because the parties address these "alleged weaknesses" separately in their briefing, the Court does so as well.

      *a)*    *The first "alleged weakness" is supported by the record.*

The first section TPG addresses is the TET's conclusion that TPG failed to provide sufficient information to demonstrate an approach:

> The Offeror did not provide sufficient information to demonstrate an approach to support these requirements. For example, the Offeror stated, "We will provide DOC with VTC integration and O&M services such as engineering, installing, upgrading, and managing new and existing systems at the desktop or in the room." (Offeror's Technical Volume, p. 37) The Offeror simply states these tasks will be conducted, but does not provide sufficient information such as processes, methodologies, and tools to demonstrate an approach.

---

[13] TPG directs its arguments to the debriefing that Commerce sent following the evaluation. Because the TET Report is the challenged agency decision, the Court addresses its resolution to the TET Report rather than the debriefing.

ECF No. 96 at AR 33062.  According to TPG, this is contrary to its proposal, which TPG asserts contains multiple statements establishing the requisite detail.

First, TPG points to the following statement: "we configure and manage customer specific media-IaaS to allow end-users to upload, process, and store their own video content. We work with the CSB to obtain additional FedRAMP-approved services."  ECF No. 99 at 20 (quoting ECF No. 76 at AR 23841-42) (emphasis omitted).  This response is from TPG's response to PWS 3.4.8 and there is no cross-reference directing the Agency to this language.  On this basis, TPG's argument fails.  That said, this section also falls short of the requirement because PWS 3.4.19 deals with video teleconferencing, not merely uploading and storing video.

Second, TPG argues that its approach is found in the following: "Our modernization designs included network changes to address jitter and latency problems that impacted VoIP call quality.  The new implementation improves service and allows for IM & presence, voicemail, and Interactive Voice Response (IVR). Our UC specialization means our voice support is a core capability, not an 'also can' offering."  ECF No. 99 at 20 (quoting ECF No. 76 at AR 23849) (emphasis omitted).  But this language comes from TPG's response to PWS 3.4.18, not 3.4.19.  Because PWS 3.4.19 deals with video teleconferencing, not merely voice conferencing, it is not readily apparent that the response to PWS 3.4.18 applies to the 3.4.19 requirements.

Third, TPG points to its statement that: "We support these mission-critical video systems through routine operational tests and immediate fault remediation to meet customer uptime requirements.  Our designs minimize electrical, network, and personnel resource requirements.  We support and train end-users to use systems effectively and upgrade systems to meet their evolving business goals."  ECF No. 99 at 20 (quoting ECF No. 76 at AR 23850) (emphasis omitted).  But this statement is in response to PWS 3.4.20, not 3.4.19, and there is no cross-reference.  In any event, PWS Section 3.4.20 deals with knowledge walls, which display information, while PWS 3.4.19 deals with two-way video communication.  Thus, it is not irrational for the agency to find this insufficient as well.

Finally, TPG relies on the following: "We will engineer and install AV display systems with video feed and display components, and program them with channel, layout, and operational controls."  ECF No. 99 at 20 (quoting ECF No. 76 at AR 23850) (emphasis omitted). This statement too is from TPG's response to PWS 3.4.20 and does not clearly provide a response to PWS 3.4.19.

Taken individually or together, the language in its proposal that TPG points to does not unambiguously address all the requirements of PWS 3.4.19.  Therefore, the Court does not find the assessment arbitrary or capricious.

> b)  *The second "alleged weakness" is supported by the record.*

TPG next turns to the TET's conclusion that:

> The Offeror also stated, "Team TPG supports the USPTO's Cisco
> Video & VTC enterprise through a UCC service desk. We resolve
> ~150 tickets monthly; ~75 for issues and ~75 for IMACD and
> project activities." (Offeror's Technical Volume, p. 37) The

> Offeror states they have past experience using a UCC service desk
> to support USPTO's Cisco Video & VTC, but does not provide
> sufficient information such as processes, methodologies, and tools
> to demonstrate an approach.

ECF No. 77 at AR 33062-63.  Here TPG argues that this Significant Weakness directly contradicts a Strength it got for its help desk approach.  ECF No. 99 at 20-21.

This argument puts too much weight on the Strength the TET found.  The Strength was for TPG's response to PWS 3.4.2, which called for offerors to provide desk-side support services like "account and access management issues, tailoring directory service entries, organizational mailboxes, distribution lists, etc., to meet customer requirements . . . ."  ECF No. 77 at 33061. TPG got a Strength for its response to PWS 3.4.2 because of its:

> [E]xperience implementing Artificial Intelligence to eliminate
> manual forms processing as well as automated self-help desktop
> support such as password resets through Robotic Process
> Automation (RPA). The Offeror's demonstrated experience is a
> strength that exceeds PWS requirements by combining AI and
> RPA to the customer desk-side support experience resulting in
> optimized customer service and service analytics through
> consistent delivery and user self-help functionality to eliminate
> human intervention resolving issues. The Department will benefit
> by automation providing more rapid incident resolution, requiring
> less service desk staff interaction, reducing call times, and
> providing consistent resolutions to similar issues.

ECF No. 77 at AR 33061 (internal citation omitted).

Maybe those methods apply to the PWS 3.4.19 help desk requirement as well.  Maybe they do not.  It is not clear that they do given the lack of cross-reference in PWS 3.4.19 to PWS 3.4.2.  Even if they do, it is not clear that the same automation is applicable to video teleconferencing equipment.  In the TET's view, they do not correlate enough to provide a sufficient response to PWS 3.4.19.  And that is a technical question that this Court will not disturb absent clear evidence contradicting the TET's technical determination because "the role of the court is 'not to substitute its judgment for that of the agency,' but rather to determine whether the agency had a rational basis for its decision."  *Vanguard Recovery Assistance v. United States*, 101 Fed. Cl. 765, 784-85 (2011) (internal citation and quotation marks omitted). Finding none, the Court does not disrupt the evaluation.

The Government further argues that the prior experience operating a help desk that TPG relies upon does not satisfy the requirement to provide the processes or methodologies to demonstrate the necessary approach.  Perhaps recognizing that its proposal does not address the methodologies that TPG proposed to use, TPG argues in its reply that Commerce used unstated evaluation criteria to fault TPG for not providing its "processes, methodologies or tools."  ECF No. 116 at 6-11.  It is, of course, beyond dispute that Commerce may only evaluate the proposals against the criteria in the RFP.  "In soliciting bids from contractors, 'agencies must evaluate

proposals and make awards based on the criteria stated in the solicitation' and 'may not rely upon undisclosed evaluation criteria in evaluating proposals.'" *Banknote*, 56 Fed. Cl. at 386 (citation omitted); *see also* 48 C.F.R. § 8.405-3(b)(1)(ii)(C) (requiring agencies to ensure that an "award is made in accordance with the basis for selection in the RFQ."); 48 C.F.R. § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."); *Lab'y Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 650 (2014) (agencies "must evaluate offerors' proposals based on the evaluation criteria stated in the solicitation").

According to TPG, the "focus" of RFP Section M.2.3(a)a's evaluation criteria are an Offeror's "ability" and "approach."  ECF No. 116 at 8.  Thus, TPG contends that whether it provided sufficient detail about its methodologies was an impermissible unstated criterion.  TPG's argument fails under the RFP.  As the Court grappled with in *Allicent*, Section M.2.3(a)a does not use the word "approach" at all.  This leads to a potential interpretive conflict because Section L instructs Offerors that they must provide a detailed technical "approach" to all the work in each PWS Section.  But the only provision of Section M that deals with the PWS states that the Agency would evaluate "ability" but not "approach."  And reading Section M makes clear that "ability" and "approach" mean different things in this RFP.

When reading all of Section M.2.3(a)a, it becomes clear that Commerce would evaluate more than just an ability.  Rather, Section M.2.3(a)a explicitly states that commerce would evaluate Offerors' ability to "use proven, innovative *methods* to meet the Final CATTS PWS requirements, resolve complex issues, and provide continuous process improvement and implementation, all while maintaining and tracking high levels of customer satisfaction."  ECF No. 68 at AR 1490 (emphasis added).  It goes without saying that Commerce cannot evaluate the methods an offeror intends to implement if the offeror does not provide sufficient information about those methods.  While the TET used the phrase "processes, methodologies or tools," it is clear that it was referring to the methods that Section M.2.3(a)a provided would be part of the evaluation of an Offeror's response to the PWS work.  Thus, the RFP wholly permits the TET to assess a Significant Weakness when an Offeror failed to provide sufficient detail about the methods they planned to implement.

c)      *The third "alleged weakness" is supported by the record.*

Here, TPG challenges the TET's finding that:

> In another example, the Offeror stated, "At SSA, we provided video and VTC O&M for the largest federal Polycom VTC enterprise, including virtualized resource management and scheduling applications, over 3,200 endpoints, redundant multipoint bridges, and globally deployed gateway devices. We provided video and VTC O&M through an on-site service desk and completed hundreds of global IMACDs a month through field support. We led the design, installation, and configuration for DVTC, SVTC, and core VTC infrastructure at multiple data centers and monitored network and circuit capacity and system availability." (Offeror's Technical Volume, p. 37) The Offeror

28

> states they have past experience providing SSA video & VTC
> O&M as well as the design, installation, and configuration, but
> does not provide sufficient information such as processes,
> methodologies, and tools to demonstrate an approach. The
> Offeror's failure to demonstrate its approach to support
> requirements will leave the Department without the required
> support to ensure proper maintenance, troubleshooting and
> corrective action, which substantially increases VTC
> communication system downtime and outages.

ECF No. 96 at AR 33063.  Here too TPG points to several sections of its proposal that do not
respond to 3.4.19 and fails to identify a cross-reference that directed the Government to these
sections.  *See* ECF No. 99 at 21-22.  Again, such arguments do not comport with the RFP's
instructions to include cross-references and the Court will not fault the Agency for not piecing
together all these disparate sections to cobble together a response to PWS 3.4.19.

In addition, TPG points to a pair of flowcharts that diagram its "service delivery
framework" that includes a statement that this framework would apply to PWS 3.4.19.  Again,
the RFP requires offerors to include a "detailed technical approach" that "clearly address[es]
each of the technical evaluation criteria in Section M."  ECF No. 68 at AR 1479.  But, as the
Government contends, that flowchart, ECF No. 76 at AR 23839, and a related flowchart relating
to Task Area 3 (that states it applies to PWS 3.4.19 as well), ECF No. 76 at AR 23833, do not
provide the detailed methodologies sufficient to demonstrate an approach.  They provide high-
level information, but the Court does not find anything that clearly contradicts the Government's
contention that these flowcharts do not provide sufficient information about the methodologies
that TPG proposed to utilize to perform this work.

    4.    <u>3.4.20</u>

PWS 3.4.20 requires contractors "to provide a knowledge wall and video display
integration, operations, and maintenance support."  ECF No. 77 at AR 29565.  Like with Section
3.4.19, TPG breaks its challenges to the Significant Weakness regarding PWS 3.4.20 into a set of
"alleged weaknesses."  The record is clear, however, that the TET only assessed one Significant
Weakness to TPG's proposal for PWS 3.4.20.  TPG's challenges to this evaluation, however, are
mere disagreements with the TET's conclusions and fail to establish any error.  Here, the Court
does not address these "alleged weaknesses" separately because TPG's separation of them makes
little sense.

The TET provided the following explanation for its rating:

> The Offeror did not provide sufficient information to demonstrate
> an approach to support these requirements. For example, the
> Offeror stated, "Team TPG will provide DOC with knowledge
> wall and video display integration and O&M services. We will
> engineer and install AV display systems with video feed and
> display components, and program them with channel, layout, and
> operational controls." (Offeror's Technical Volume, p. 37) The

Offeror simply states these tasks will be conducted, but does not provide sufficient information such as processes, methodologies, and tools to demonstrate an approach.

In addition, the Offeror stated, "Team TPG's in-house engineers and programmers implement, operate, and maintain video solutions: enterprise video signage and video broadcast systems at HHS-TV; Emergency Operations centers at FBI; and public hearing broadcast facilities for the SEC and FEC. We support these mission-critical video systems through routine operational tests and immediate fault remediation to meet customer uptime requirements. Our designs minimize electrical, network, and personnel resource requirements. We support and train end-users to use systems effectively and upgrade systems to meet their evolving business goals." (Offeror's Technical Volume, p. 37) The Offeror states they have past experience providing support at HHS-TV, Emergency Operations centers at FBI, and public hearing broadcast facilities for the SEC and FEC, but does not provide sufficient information such as processes, methodologies, and tools to demonstrate an approach. The Offeror's failure to demonstrate its approach to support requirements will leave the Department without critical communications needed to maintain operational readiness and support mission critical requirements.

ECF No. 77 at AR 33063-64.

TPG addresses these two paragraphs as separate "alleged weaknesses." The entirety[14] of TPG's response to the first paragraph (what the Government identifies as the "fourth alleged weakness") is to quote the text from its proposal that the TET quoted in the second paragraph. ECF No. 99 at 24 (quoting ECF No. 77 at AR 33063). And the entirety of the response to the second paragraph (what the Government identifies as the "fifth[15] alleged weakness") is to quote the text from its proposal that the TET quoted in the first paragraph. ECF No. 99 at 24-25 (quoting ECF No. 77 at AR 33063). In other words, TPG's argument is akin to "just read our proposal." But the TET did read the proposal, clearly considered all the text that TPG insists satisfy PWS 3.4.20, and concluded that it did not satisfy the requirements. TPG's mere

---

[14] TPG initially refers "to the objective data points and proposal information cited above" as supporting its challenge to this evaluation. ECF No. 99 at 24. There are two problems with this. First, it is unclear what exactly TPG is trying to incorporate here. TPG does not explain how its responses to these disparate sections relate to these requirements. Second, these "data points and proposal information" are not cross-referenced in TPG's proposal.

[15] The government understandably lost track of these unnumbered "alleged weaknesses" and has identified two different alleged weaknesses as the "fifth alleged weakness." ECF No. 113 at 101. The Court is referring to the first of these "fifth alleged weaknesses" that addresses PWS 3.4.20. The second "fifth alleged weakness" addresses TPG's challenge to the TET's evaluation of TPG's response to PWS 3.6.1. *See* ECF No. 113 at 101-02.

disagreement with the TET's conclusion is insufficient to establish error.  *Poplar Point*, 147 Fed. Cl. at 212.

Further, the TET's conclusion is rational and adequately supported by the record.  First, the RFP makes clear that "[t]he Government considers statements that the prospective Offeror understands, can, or will comply with the specifications, or statements paraphrasing the requirements or parts thereof to be inadequate and unsatisfactory."  ECF No. 68 at AR 1474. Thus, the TET was authorized, if not compelled, by the RFP to conclude that TPG "simply stat[ing] these tasks will be conducted . . . does not provide sufficient information such as processes, methodologies, and tools to demonstrate an approach."  ECF No. 77 at AR 33063. Reviewing TPG's proposal, the Court finds the TET's conclusion—that TPG merely states it will do the work without explaining how—to be supported by the record.  Thus, TPG fails to establish error with the TET's evaluation of PWS 3.4.20.

5.      3.6.1

PWS 3.6.1 requires contractors "to provide diverse Cybersecurity and Information Assurance (IA) services that enforce, comply with, and support the Federal Information Security Management Act (FISMA) cybersecurity and IA security directives, Department of Homeland Security (DHS), DOC, and NIST policies and procedures. Cybersecurity and IA include a wide-range of technical, functional, and managerial services necessary to ensure the secure operation of systems."  ECF No. 77 at AR 29574-75.  The TET assessed a third Significant Weakness for TPG's response to PWS 3.6.1 because:

> The Offeror's proposal did not address security architecture and
> security engineering requirements and states that the Offeror
> performs Cybersecurity requirements in accordance with NIST SP
> 800-53 R4, among other standards (Offeror's Technical Volume,
> p. 45). The current publication of NIST SP 800-53 is revision 5, in
> effect as of September 2021. The Department is at risk of not only
> meeting today's standards but regressing to outdated or
> nonapplicable standards that endangers the protection of
> Department data, assets, information, and personnel. This is a
> significant weakness that severely jeopardizes the Department's
> ability to respond to current and emerging cybersecurity threats
> and comply with highly visible FISMA and OMB mandates.

*Id*. at AR 33064.  Because the parties incorporated their arguments regarding the initial evaluation to this evaluation, the Court addresses those arguments as if directed at the Corrective Action evaluation.

In disputing the TET's conclusion that TPG failed to address "security architecture and security engineering requirements," TPG points to a litany of quotes from throughout its proposal to show that it addressed these requirements.  As an initial matter, like the Court did in *Allicent* and above, this Court is not going to fault the agency for not cobbling together information from all corners of TPG's proposal to satisfy PWS 3.6.1 absent the cross-references that the RFP instructed offerors to use if they did not want to repeat information.

Similarly, TPG insists that certain Strengths the TET found in its proposal contradict the conclusion that TPG failed to address security architecture development, security engineering, and compliance with NIST SP 800-53. ECF No. 99 at 13-14. But there is nothing in these Strengths that unambiguously demonstrates that TPG addressed security architecture development or security engineering requirements. As an initial matter, TPG states that six of its nine strengths "are security engineering related," ECF No. 99 at 13, but leaves it to the Court to figure out which ones. And other than TPG's bald assertion, there is nothing to explain why these (unspecified) Strengths do, in fact, relate to "security engineering." This bare assertion of disagreement with the TET's evaluation is not sufficient to establish error. *Poplar Point*, 147 Fed. Cl. at 212 ("An offeror's disagreement with the agency's judgment, without more, is insufficient to establish that the agency acted unreasonably.").

Turning to the references to disparate parts of TPG's proposal, the Court concludes that even if the RFP did not call for cross-references, these references do not establish error. First, TPG points to several statements about how it will ensure compliance with standards as examples of "security architecture" or "security engineering." ECF No. 99 at 14-17 (¶¶ a, b, e, h, m). These references fail to establish error under the RFP. As an initial matter, the RFP requires "security architecture *development*," not "security architecture." ECF No. 68 at AR 1252 (emphasis added). The Government is correct that ensuring compliance with security architectures developed by others does not constitute "development." Nor does ensuring compliance with security requirements constitute "security engineering" under the RFP, which separately requires Offerors to provide *both* "security engineering" and "security compliance." ECF No. 68 at AR 1252. Given that Commerce required both in the same subsection, the Court understands them to mean different things. *Allicent*, 166 Fed. Cl. at 146. Thus, ensuring compliance does not mean that TPG has met the requirement to provide security architecture development or security engineering.

Second, TPG points to various statements where it commits to perform the requirements of 3.6.1. The Government recognizes that TPG provided certain information that is responsive to the RFP but concluded that the cited sections do not provide enough information to demonstrate TPG's ability because they do not explain the methods that TPG will use to accomplish the tasks it commits to do. ECF No. 113 at 90-91 (paragraphs starting "third" and "fourth"), 94-95 (paragraphs starting "eleventh" and "fourteenth") (citing ECF No. 99 at 14-17 ¶¶ c, d, k, n). The Court has reviewed TPG's cited sections and does not see anything that clearly contradicts the agency's determination. Therefore, the Court does not find error in the agency not crediting these references as sufficiently detailed to satisfy the RFP.

Third, TPG contends that its commitment to perform certain application development activities shows it addressed security architecture development and security engineering. ECF No. 99 at 15-16 (¶¶ f, g, i, j.). The Government acknowledges this as well but found that development activities related to ensuring that applications comply with security engineering and architecture standards that others develop, not that TPG would be developing those standards. ECF No. 113 at 92-94 (paragraphs starting "sixth," "seventh," "ninth," "tenth"). As explained above, the RFP differentiates between security engineering, security architecture development, and security compliance. The Court does not find the Agency's assertion that the compliance function does not satisfy the development and engineering requirements arbitrary and capricious.

Finally, TPG referred to its monitoring of the health of an enterprise architecture as proof of its security architecture.  ECF No. 99 at 16 (¶ l).  There are two problems.  First, such monitoring is responsive to PWS Section 3.6.2 rather than 3.6.1.  Second, it is not at all clear that monitoring the health of an enterprise architecture is response to a requirement for "security architecture development."

In addition, TPG takes issue with the TET's conclusion that TPG's use of NIST SP 800-53 r.4 rather than the current version, r.5.  According to TPG, the PWS does not mandate the use of NIST 800-53 r.5.  ECF No. 99 at 17.  But the PWS does require contractors to "enforce, comply with, and support . . . NIST policies and procedures."  ECF No. 77 at AR 29574.  It is not unreasonable for the Agency to expect that offerors will utilize current versions of such policies and procedures.  And revision 5 was "in effect as if September 2021," well before TPG submitted its proposal in April 2022.  ECF No. 77 at AR 33064.

Thus, the Court finds no reason to disturb the agency's evaluation of TPG's technical proposal.

### F.    Injunctive Relief

When determining whether to issue a permanent injunction, a court considers: (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors granting relief; and (4) whether granting injunctive relief is in the public interest.  *PGBA, LLC v. United States*, 389 F.3d 1219, 1228 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987)).  As explained above, no plaintiff has succeeded on the merits.  Because success on the merits is necessary to receive permanent injunctive relief, the Court denies all motions for a permanent injunction.  The Court need not consider the remaining factors because "[a]bsent success on the merits, the other factors are irrelevant."  *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 357 n.32 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003).

### IV.    Conclusion

For the foregoing reasons, the Court:

1. DENIES Syneren Technologies Corp.'s motion for judgment on the administrative record, ECF No. 103.

2. DENIES CAN Softtech, Inc.'s motion for judgment on the administrative record, ECF No. 102.

3. DENIES Ekagra Partners, LLC's motion for judgment on the administrative record, ECF No. 101.

4. DENIES JCS Solutions, LLC's motion for judgment on the administrative record, ECF No. 105.

5.  DENIES The Prospective Group, Inc.'s motion for judgment on the administrative record, ECF No. 99.

6.  GRANTS the United States's cross-motion for judgment on the administrative record, ECF No. 113.

7.  GRANTS Riva Solutions, Inc.'s cross-motion for judgment on the administrative record, ECF No. 114.

8.  GRANTS Brightpoint, LLC's cross-motion for judgment on the administrative record, ECF No. 110.

9.  GRANTS ProGov Partners, LLC's cross-motion for judgment on the administrative record, ECF No. 109.

10. GRANTS ITC-DE, LLC, D/B/A DOTIT's cross-motion for judgment on the administrative record, ECF No. 115.

11. GRANTS Halvik Corp.'s cross-motion for judgment on the administrative record, ECF No. 112.

12. GRANTS T and T Consulting Services, Inc.'s cross-motion for judgment on the administrative record, ECF No. 111.

13. DENIES-AS-MOOT Plaintiffs' motion for preliminary injunction, ECF No. 131.

14. DIRECTS the Clerk's Office to enter judgment accordingly.

It is so ORDERED.

<u>s/ Edward H. Meyers</u>
Edward H. Meyers
Judge